IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ESTATE OF JEREMY HUNTER, by its Personal Representative, BRIAN HUNTER,<br><br>Plaintiff,<br><br>v.<br><br>UINTAH COUNTY; KATIE SMITH; R.S. SMUIN; COLE ANDERTON; JULIANNE EHLERS; DEPUTY GRAY; RICHARD GOWEN; DEPUTY GURR; DEPUTY HARRISON; DEPUTY JENSEN; DEPUTY KELLY; GALE ROBBINS; ROLLIN COOK; and, John and Jane Does 1 thru 25,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br>Case No. 2:16-CV-1248 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on a Motion for Summary Judgment filed by Defendants

Uintah County, Katie Smith, Cole Anderton, Richard Gowen, Caitlyn Gurr, Cody Harrison,

Tony Jensen, Daren Kelly, and Gale Robbins.[1]  For the reasons discussed below, the Court will

grant the Motion.

## I.  BACKGROUND

This case arises from the death of Jeremy Hunter, an inmate at the Uintah County Jail.

Mr. Hunter was booked into the Uintah County Jail on December 18, 2014, at approximately

---

[1] All claims against Defendant Rollin Cook were dismissed on November 27, 2017.  *See* Docket No. 43.  Plaintiff's third cause of action (except as to Uintah County) and fourth cause of action, along with the claims against Defendants Julianne Ehlers and Deputy Gray were dismissed on November 19, 2018.  *See* Docket No. 59.  Defendant Smuin was never served and has passed away.  Plaintiff's ADA claim was withdrawn at the hearing on June 4, 2019.  As a result, only  Plaintiffs' claim under the Eighth Amendment remains for decision.

1:00 p.m.  During the booking process, Mr. Hunter informed Deputy Cole Anderton that he had high blood pressure and was taking blood pressure medication, but that he did not have any medication or prescriptions with him.  This information was passed along to Nurse Smuin, a registered nurse, who worked at the jail.  Deputy Anderton asked Mr. Hunter if he was in any pain or required immediate health care and Mr. Hunter reported that he was not in pain and did not require immediate health care.

The following afternoon, Mr. Hunter requested that his blood pressure be taken.  Nurse Smuin's notes indicate that his blood pressure was 163/121.  Mr. Hunter's blood pressure was also taken manually and was 160/108.  Nurse Smuin called a pharmacy and had Mr. Hunter's blood pressure medications transferred to another pharmacy and indicated that they would be picked up the next morning.

Corporal Gale Robbins came on as the supervising officer on December 19, 2014, at 6:00 p.m.  Corporal Robbins was informed that Mr. Hunter had complained of chest pain and anxiety.  Corporal Robbins was informed that Mr. Hunter had been seen by Nurse Smuin and physician's assistant ("P.A.") Logan Clark and that Mr. Hunter would be fine throughout the night and that officers should observe him.

At 7:15 p.m., Mr. Hunter complained of numbness and pain.  Deputy Cody Harrison gave Mr. Hunter ibuprofen and a decongestant.  Deputy Harrison took Mr. Hunter's vitals and his blood pressure was 171/100.[2]  Deputy Harrison relayed this information to Corporal Robbins.  Two later blood pressure readings were also elevated: 188/133 and 176/118.

---

[2] Corporal Robbins testified that Deputy Harrison believed this reading was possibly inaccurate either because of machine or user error.  Docket No. 77-11, at 20:8–14; 41:17–42:21.

At 11:22 p.m., officers received a call from Pod Control asking them to check on Mr. Hunter. Deputies Caitlyn Gurr, Cody Harrison, Tony Jensen, and Daren Kelly all responded. The deputies observed Mr. Hunter on the floor on his hands and knees, spitting saliva. Mr. Hunter related that he was having pains. Corporal Robbins was then summoned. Officers moved Mr. Hunter to a lower bunk and provided an extra mattress to try to make Mr. Hunter comfortable. Corporal Robbins attempted to calm Mr. Hunter and help him relax. Mr. Hunter's blood pressure was taken with a reading of 130/98.

Officers continued to attend to Mr. Hunter. They offered to move Mr. Hunter to booking so that he could be more closely monitored, but Mr. Hunter declined and stated that he would be fine. Corporal Robbins told Mr. Hunter to ask for help if he needed anything. By the time officers left Mr. Hunter's cell at 11:45 p.m., he was no longer in a panicked state and appeared to be resting peacefully.

Around this same time, Corporal Robbins contacted Nurse Smuin to inform her of the situation. Nurse Smuin told Corporal Robbins that P.A. Clark had seen Mr. Hunter and that the officers just needed to keep an eye on him. When asked by Corporal Robbins whether Mr. Hunter should be taken to the hospital, Nurse Smuin said "no" and that P.A. Clark had stated that Mr. Hunter's heart was not the problem.

At approximately 2:30 a.m. on December 20, 2014, Mr. Hunter again complained of chest pain and anxiety. Mr. Hunter's blood pressure was taken and was 111/80. Mr. Hunter was moved to the booking area where he could be more closely monitored. Mr. Hunter was permitted to shower and received clean clothes and sheets. He then returned to his cell and slept.

At approximately 3:15 a.m., Corporal Robbins called Nurse Kate Smith, another nurse who worked at the jail. Corporal Robbins reported to Nurse Smith that Mr. Hunter was complaining of chest pains and anxiety attacks. Corporal Robbins relayed that Mr. Hunter's blood pressure was 111/80. Based upon this information, Nurse Smith told Corporal Robbins to have Mr. Hunter drink plenty of fluids and try to relax, and that she would check on him when she started her shift. Nurse Smith told Corporal Robbins that he should call her, Nurse Smuin, or P.A. Clark if Mr. Hunter's pain worsened.

When Mr. Hunter woke up at approximately 5:30 a.m., he reported to Corporal Robbins that he was feeling a lot better and had not felt so good in a while.

Nurse Smith arrived at the jail at 6:00 a.m. Upon arrival, she went directly to see Mr. Hunter. Nurse Smith checked Mr. Hunter's vital signs and he had a blood pressure of 140/98. Nurse Smith informed Mr. Hunter that she would pick up his medication as soon as the pharmacy opened at 9:00 a.m.

At 8:15 a.m., Mr. Hunter informed Nurse Smith that he had vomited. Nurse Smith provided over-the-counter nausea medication and again took Mr. Hunter's vitals, which were within the normal ranges.

At 8:30 a.m., Nurse Smith contacted Nurse Smuin to report Mr. Hunter's vitals and that he had been complaining of chest pain. Nurse Smuin stated that they should continue to monitor Mr. Hunter and get his medications.

Nurse Smith left the jail for the pharmacy at 8:50 a.m. and returned with Mr. Hunter's medication at 9:15 a.m. Mr. Hunter stated that he had recently thrown up, but was up and moving around well and did not appear to need medical attention or treatment. Mr. Hunter was

then given his medication.  Soon thereafter, Mr. Hunter clutched his chest and collapsed on the floor.

Several officers attended to Mr. Hunter, performing CPR and administering chest compressions until an ambulance arrived.  Mr. Hunter was transported to the hospital and was later pronounced dead.  The cause of death was pericardial tamponade due to aortic dissection due to hypertensive cardiovascular disease.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]  In considering whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[4]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[5]

## III.  DISCUSSION

A.    INDIVIDUAL DEFENDANTS

The Eighth Amendment's ban on cruel and unusual punishment "requires jail officials 'to provide humane conditions of confinement" including "adequate food, clothing, shelter, and

---

[3] Fed. R. Civ. P. 56(a).

[4] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[5] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

medical care."[6]  In *Estelle v. Gamble*,[7] the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment."[8]

"Deliberate indifference involves both an objective and a subjective component."[9]  The objective component is met if the deprivation is "sufficiently serious."[10]  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[11]

The subjective component is met only if a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[12]  Thus, "a plaintiff must establish that defendant(s) knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'"[13] [P]rison officials who lacked knowledge of a risk cannot be said to have inflicted punishment."[14] Additionally, "prison officials who actually knew of a substantial risk to inmate health or safety

---

[6] *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998)).

[7] 429 U.S. 97 (1976).

[8] *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

[9] *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000).

[10] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

[11] *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

[12] *Farmer*, 511 U.S. at 837.

[13] *Hunt*, 199 F.3d at 1224 (quoting *Farmer*, 511 U.S. at 847).

[14] *Farmer*, 511 U.S. at 844.

may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."[15] "[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."[16]

Additionally, the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation."[17] Similarly, "accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute a medical wrong under the Eighth Amendment."[18]

> So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met. Indeed, our subjective inquiry is limited to consideration of the doctor's knowledge at the time he prescribed treatment for the symptoms presented, not to the ultimate treatment necessary.[19]

### 1. Objective Component

As stated above, Mr. Hunter had a heart attack while at the jail and later passed away. The Tenth Circuit has held that a prisoner's heart attack and death are "without doubt, sufficiently serious to meet the objective component."[20] Thus, Plaintiff's evidence is sufficient to withstand summary judgment as to the objective component.

---

[15] *Id.*

[16] *Id.* at 845.

[17] *Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 811 (10th Cir. 1999).

[18] *Ramos*, 639 F.2d at 575.

[19] *Self v. Crum*, 439 F.3d 1227, 1233 (10th Cir. 2006).

[20] *Martinez v. Beggs*, 563 F.3d 1082, 1088–89 (10th Cir. 2009); *see also Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005) (stating that "severe chest pain, a symptom consistent with a

2.      *Subjective Component*

With regard to the subjective component, it is necessary to evaluate the claims against each Defendant individually.[21]  Plaintiff must present evidence that each defendant knew of and disregarded an excessive risk to inmate health or safety.[22]  The role of each Defendant is addressed below.

a.      Katie Smith

Nurse Smith was a nurse working at the jail.  She received a call from Corporal Robbins at approximately 3:15 a.m. on December 20.  Corporal Robbins informed her of Mr. Hunter's situation and relayed his vital signs, with his blood pressure being 111/80.  Nurse Smith was not informed of the prior elevated blood pressure readings and was unaware of Mr. Hunter's history of hypertension.  Based on the information she had, Nurse Smith advised Corporal Robbins to have Mr. Hunter drink plenty of liquids and try to relax.  She also informed Corporal Robbins that she would check on Mr. Hunter when her shift began at 6:00 a.m., but that he should contact herself, Nurse Smuin or P.A. Clark if Mr. Hunter's pain worsened.  When Nurse Smith arrived at the jail, she immediately went to check on Mr. Hunter.  She checked Mr. Hunter's vital signs and contacted her supervisor, Nurse Smuin, to advise her of the situation.  Nurse Smith also went to the pharmacy to pick up Mr. Hunter's blood pressure medications as soon as it opened and

---

heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard").

[21] *See Mata*, 427 F.3d at 755 (addressing claims against each defendant individually).

[22] *Farmer*, 511 U.S. at 837; *see also Jenkins v. Utah Cty. Jail*, No. 2:11-CV-761 RJS, 2015 WL 164194, at *17 (D. Utah Jan. 13, 2015) (stating that "courts consider whether the subjective component of the deliberate indifference standard has been satisfied for each defendant based on the individual's role and the facts known by each at the time of the conduct").

promptly provided Mr. Hunter his medication when she returned. Under these circumstances, no reasonably jury could conclude that Ms. Smith was deliberately indifferent. Rather, she took reasonable measures, based on the information she knew, to treat Mr. Hunter. Therefore, summary judgment is appropriate.

        b.     Cole Anderton

Deputy Anderton was the officer who booked Mr. Hunter into the jail. Deputy Anderton completed the booking form, which indicated that Mr. Hunter had hypertension and was taking medications. This information was passed along to Nurse Smuin, who was responsible for helping obtain medications for prisoners. Deputy Anderton asked Mr. Hunter if he was in any pain or required immediate health care and Mr. Hunter reported that he was not in pain and did not require immediate health care. Deputy Anderton had no other interaction with Mr. Hunter on December 18 and did not work on December 19. On December 20, Deputy Anderton was one of the officers who responded when Mr. Hunter collapsed. At that time, he performed CPR and chest compressions. Under these circumstances, no reasonable jury could conclude that Deputy Anderton was deliberately indifferent.

        c.     Richard Gowen

Corporal Gowen first interacted with Mr. Hunter on December 20. When Corporal Gowen came in for his shift that morning, he learned that Mr. Hunter was having pains, that Nurse Smith was getting Mr. Hunter's medications, and that Mr. Hunter was being kept in booking for closer observations. Corporal Gowen observed Mr. Hunter and nothing about his observations caused him any concern. Rather, Mr. Hunter was either standing or walking in his cell. Later, when Mr. Hunter collapsed, Corporal Gowen had another officer contract dispatch to

call for an ambulance and gave another officer an Automated External Defibrillator to use. No reasonable jury could conclude that Corporal Gowen was deliberately indifferent.

        d.     Caitlyn Gurr

Deputy Gurr was one of the deputies who worked the afternoon and overnight shift beginning on December 19. Deputy Gurr and others responded to Mr. Hunter's cell when they received a call from Pod Control at approximately 11:22 p.m. She observed Mr. Hunter on his hands and knees clutching his chest and stating that he was having pain. Deputy Gurr tried to calm Mr. Hunter down and called for her supervisor, Corporal Robbins. Deputy Gurr also took Mr. Hunter's blood pressure, which was 130/98. After Deputy Gurr and the other officers interacted with Mr. Hunter for about fifteen minutes, his condition seemed to improve, and they left his cell. Deputy Gurr next interacted with Mr. Hunter at about 3:15 a.m. when he again complained of chest pains. Deputy Gurr and Corporal Robbins took Mr. Hunter's vitals and his blood pressure was 111/80. Deputy Gurr believed that Corporal Robbins had contacted the nurses to relay the information about Mr. Hunter's condition. This is documented in a contemporaneously-created report.[23] Prior to her shift ending, Deputy Gurr observed Mr. Hunter sleeping. No reasonable jury could conclude that Deputy Gurr was deliberately indifferent.

        e.     Cody Harrison

Deputy Harrison also worked the afternoon and overnight shift on December 19. At 6:30 p.m. that evening, Deputy Harrison was told by the day shift that Mr. Hunter reported having a panic attack earlier. At 7:15 p.m., Mr. Hunter complained of numbness and pain. In response, Mr. Harrison gave Mr. Hunter ibuprofen and a decongestant. Deputy Harrison took Mr.

---

[23] Docket No. 68-1.

Hunter's vitals. Mr. Hunter's blood pressure was 171/100. Deputy Harrison relayed this information to Corporal Robbins who he believed contacted the jail nurses. Around 11:30 p.m., Deputy Harrison was one of the officers who responded to Mr. Hunter's cell. Deputy Harrison observed Deputy Gurr take Mr. Hunter's blood pressure, which by that time was 130/98. At 2:26 a.m., Deputy Harrison helped move Mr. Hunter to booking so that he could be monitored more closely. Deputy Harrison had no further interaction or contact with Mr. Hunter. Based upon these facts, no reasonable jury could find Deputy Harrison was deliberately indifferent.

      f.     Tony Jensen

Deputy Jensen too worked the overnight shift on December 19. He was one of the officers to respond to Mr. Hunter's cell. Deputy Jensen observed Mr. Hunter on his knees and believed he was having a panic attack. Deputy Jensen, along with the other officers, took efforts to make Mr. Hunter more comfortable, including moving his mattress to a lower bunk and providing an additional mattress. By the time the officers left his cell, Mr. Hunter stated that he was fine and did not want to be moved. Mr. Hunter no longer appeared to be in a panicked stated, but instead appeared to be resting peacefully. No reasonable jury could conclude that Deputy Jensen was deliberately indifferent.

      g.     Daren Kelly

Deputy Kelly worked the overnight shift on December 19. Like the other officers, he responded to Mr. Hunter's cell around 11:22 p.m. He observed Mr. Hunter sitting on the floor and complaining of chest pain. Deputy Kelly asked Deputy Harrison to get the medical cart. Mr. Hunter's vitals were then taken. Based upon those numbers (blood pressure was 130/98), Deputy Kelly was not concerned, and Mr. Hunter appeared to be calming down. Deputy Kelly

believed that Corporal Robbins contacted the nurse about the situation. By the time he left Mr. Hunter's cell at 11:45, Mr. Hunter seemed to be resting quietly and was doing much better. Deputy Kelly had no further interaction with Mr. Hunter. Based upon these facts, no reasonable jury could conclude that Deputy Kelly was deliberately indifferent.

> h.    Gale Robbins.

Corporal Robbins was the commanding officer and shift leader for the overnight shift on December 19. When he arrived for his shift, Corporal Robbins learned that Mr. Hunter had been experiencing chest pains and anxiety. Corporal Robbins was told that Nurse Smuin and P.A. Clark had seen Mr. Hunter and that he would be fine throughout the night, but that the officers should observe him.

At some point later that evening, it was reported to Corporal Robbins that Mr. Hunter was complaining of chest pains and anxiety. Corporal Robbins had Deputy Harrison take Mr. Hunter's vitals. That reading and two later readings indicated extremely high blood pressure. However, later readings showed much lower blood pressure.

Corporal Robbins responded with the other officers when called to Mr. Hunter's cell at approximately 11:22 p.m. Corporal Robbins, along with the others, helped make Mr. Hunter more comfortable. In particular, Corporal Robbins taught Mr. Hunter some breathing exercises to help him relax.

Around this time, Corporal Robbins contacted Nurse Smuin to inform her of the situation. Corporal Robbins was informed that P.A. Clark had seen Mr. Hunter and that the officers just needed to keep an eye on him. When he asked Nurse Smuin if she thought Mr.

Hunter should go to the hospital, she said no, and that P.A. Logan had stated that Mr. Hunter's heart was not the problem.

At 2:30 a.m., when Mr. Hunter again complained of chest pains, Corporal Robbins had Mr. Hunter moved to booking so that he could observe him more closely. He also worked with Mr. Hunter on breathing exercises, allowed Mr. Hunter to take a shower, and provided him with clean clothes and sheets.

Corporal Robbins then contacted Nurse Smith and informed her of the situation. Nurse Smith told Corporal Robbins to have Mr. Hunter drink fluids and try to relax. She also stated that she would check on Mr. Hunter when she arrived for her shift. Around this time, Mr. Hunter fell asleep and slept for the majority of Corporal Robbins' remaining shift. When he woke up, Mr. Hunter informed Corporal Robbins that he was feeling much better. No reasonable jury could find that Corporal Robbins was deliberately indifferent. Rather, he took reasonable measures to alleviate Mr. Hunter's medical issues and reasonably relied on the advice of medical professionals.[24]

     i.     Conclusion as to Individual Defendants

In sum, all of the individual Defendants acted reasonably based on the information they knew. The individual Defendants responded to Mr. Hunter's complaints and sought out the

---

[24] *Cf. Weatherford ex rel. Thompson v. Taylor*, 347 F. App'x 400, 404 (10th Cir. 2009) (stating that "unreasonable reliance on the advice of a medical professional will not excuse deliberate indifference to a prisoner's serious medical needs"); *see also Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (stating that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference").

advice of supervisors and/or medical professionals.  They then relied upon that advice in providing care to Mr. Hunter.

This case is distinguishable from *Weatherford ex rel. Thompson v. Taylor*, a case relied upon by Plaintiff.  In that case, Taylor, a jail employee, was informed by medical personnel that Mr. Weatherford had been complaining of chest pain, but would be fine until morning.  Taylor was later informed that Mr. Weatherford was pale, holding his chest, and that other inmates were saying that he was having a heart attack.  Taylor moved Mr. Weatherford to the booking area for closer observations, but merely looked in on him every fifteen minutes.  She made no attempt to speak to him.  The evidence also showed that Mr. Weatherford and other inmates repeatedly and loudly complained about the severity of Mr. Weatherford's chest pain and the need for medical assistance.  However, at no point did Taylor attempt to contact the jail's medical staff or seek outside care for Mr. Weatherford.  Mr. Weatherford eventually died of a heart attack.

The Tenth Circuit found that these facts precluded summary judgment against the jail employee.  The court found that "[i]t may have been reasonable for Taylor to initially discount the severity of Weatherford's medical condition, given [the medical staff's] assertions that Weatherford was hurting on the wrong side of his chest for a heart attack and that he would be fine until morning."[25]  "But it quickly became obvious that Weatherford needed immediate medical attention."[26]  As stated, Mr. Weatherford was pale, clutching his chest, and other inmates were saying he was having a heart attack.  Taylor then moved Mr. Weatherford to

---

[25] *Weatherford*, 347 F. App'x at 403.

[26] *Id.*

booking. While "moving Weatherford to the observation cell was a step in the right direction,

[the jail employee] made no attempt to communicate with him once he was there."[27]

> Taylor failed to take any further steps, despite (1) Weatherford's and Voss's loud complaints about Weatherford's severe chest pain and need for medical assistance, which would have been audible at Taylor's desk; (2) Jailer O'Rourke's inquiry about Weatherford's presence in the observation cell after Weatherford loudly complained and asked to "see medical"; and (3) other inmates' attempts to get medical help for Weatherford once he was in the observation cell. Significantly, Taylor did not attempt to speak with [medical staff] again or otherwise seek medical assistance for Weatherford, even though Taylor knew that a person with chest pain could be suffering a medical emergency, including a heart attack.[28]

The actions of these Defendants stand in stark contrast to the jail employee in

*Weatherford.* As set forth above, Mr. Hunter's condition fluctuated while at the jail. Every time

Mr. Hunter complained, Defendants responded and took various steps to address Mr. Hunter's

needs and make him more comfortable. At various points, Mr. Hunter's condition seemed to

improve in response to the actions taken by Defendants. Defendants also periodically relayed

the situation to the jail's nurses who, based on the information they knew, reassured Defendants

that Mr. Hunter would be okay. The officers relied upon the medical opinions of the nurses and

doing so was reasonable under the circumstances presented here. While Mr. Hunter's death is

certainly tragic, none of the individual Defendants were deliberately indifferent. Defendants

reacted reasonably and, therefore, cannot be liable under the Eighth Amendment.

---

[27] *Id.*

[28] *Id.*

B.     UINTAH COUNTY

A municipality may be liable under § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."[29] However, "local governments are responsible only for 'their own illegal acts.'"[30]  "They are not vicariously liable under § 1983 for their employees' actions."[31]  In order to state a claim for municipal liability, a plaintiff must allege (1) the existence of an official policy or custom; (2) a direct causal link between the policy or custom and the constitutional injury alleged; and (3) deliberate indifference on the part of the municipality.[32]

A plaintiff may allege the existence of a municipal policy or custom in the form of (1) an officially promulgated policy; (2) an informal custom amounting to a widespread practice; (3) the decisions of employees with final policymaking authority; (4) the ratification by final policymakers of the decisions of their subordinates; or (5) the failure to adequately train or supervise employees.[33]

Defendants argue that if none of the individual Defendants are liable, the County cannot be liable.  It is often true that, where there is no underlying constitutional violation committed by an individual defendant, a municipality cannot be liable.  However, the fact that none of the individual Defendants are liable does not necessarily mean that the County cannot be liable.  The

---

[29] *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. N.Y.C. Dep't of Social Servs.*, 436 U.S. 658, 692 (1972)).

[30] *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).

[31] *Id.*

[32] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769–70 (10th Cir. 2013).

[33] *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

Tenth Circuit has held that "*Monell* does not require that a jury find an individual defendant liable before it can find a local governmental body liable."[34] "Although the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights."[35] Thus, the fact that summary judgment is granted in favor of the individual Defendants does not resolve the case as against the County.

Plaintiff complains that multiple individuals violated the Jail's policies and procedures. However, the Supreme Court has held that simply failing to follow jail policies is not a constitutional violation in and of itself.[36] Therefore, this is not sufficient to withstand summary judgment.

Plaintiff also complains that the nurses failed to follow standard medical procedures, but this is not the appropriate standard under the Eighth Amendment. At best, this supports a finding of negligence, but does not constitute deliberate indifference.[37]

Plaintiff does not point to the existence of an unconstitutional official policy or custom. However, Plaintiff does assert the existence of an informal policy discouraging jail employees from calling an ambulance in emergent situations and further points to inadequate training and education of jail staff. Both are discussed below.

---

[34] *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 310 (10th Cir. 1985).

[35] *Id.*

[36] *Davis v. Scherer*, 468 U.S. 183, 194 (1984); *see also Gains v. Stenseng*, 292 F.3d 1222, 1225 (10th Cir. 2002) ("To the extent Gaines seeks relief for alleged violations of state statutes and prison regulations, however, he has stated no cognizable claim under § 1983.").

[37] *Estelle*, 429 U.S. at 106.

To establish municipal liability under the theory of an informal custom or practice, Plaintiff must demonstrate:

> (1) The existence of a continuing, persistent and widespread practice of unconstitutional misconduct by . . . employees;
> (2) Deliberate indifference to or tacit approval of such misconduct by the . . . policymaking officials . . . after notice to the officials of that particular misconduct; and
> (3) That the plaintiff was injured by virtue of the unconstitutional acts pursuant to . . . custom and that the custom was the moving force behind the unconstitutional acts.[38]

To establish that an informal custom has become an official policy, Plaintiff must demonstrate that it amounts to "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."[39] "In order to establish a custom, the actions of the municipal employees must be 'continuing, persistent and widespread.'"[40] "In attempting to prove the existence of such a 'continuing, persistent and widespread' custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way."[41]

Here, Plaintiff has presented the testimony of one former jail employee, Amber Williams-Sutton, who testified that jail employees were discouraged from calling for an ambulance and

---

[38] *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993).

[39] *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (quotation marks and citations omitted).

[40] *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (quoting *Gates*, 996 F.2d at 1041).

[41] *Id.*

that they would face repercussions if they did so.[42]  In support of this statement, Ms. Sutton-Williams, who was no longer working at the jail at the time of Mr. Hunter's death, testified that she avoided calling an ambulance on one prior occasion because of pressure that was put on her when she called for an ambulance on an earlier date.[43]  However, she could not identify any other situations where someone was not transported to the hospital when they should have been.[44]  Further, there is no evidence that any of the individuals working at the jail at the time of Mr. Hunter's death shared this viewpoint.  Thus, the only evidence to support Plaintiff's claim is that an ambulance was not called for Mr. Hunter prior to him collapsing and an ambulance was not called on one prior occasion.

This evidence is insufficient to demonstrate the existence of an informal custom or practice.  To survive summary judgment, Plaintiff must demonstrate a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity."[45]  Evidence of two instances where an ambulance was not called is not sufficient.[46]  Therefore, summary judgment is appropriate on this issue.

---

[42] Docket No. 77-2, at 82:1–19.

[43] *Id.* at 92:2–93:20.

[44] *Id.* at 93:21–94:2.

[45] *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quoting *Pembaur*, 475 U.S. at 484).

[46] *Connick*, 563 U.S. at 62 (finding that four prior *Brady* violations insufficient to impose municipal liability); *Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* . . . ."); *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995) (holding that a "few incidents of discrimination . . . failed to establish a genuine dispute of material fact about whether the City had a custom of discriminatory employment practices").

Plaintiff also asserts municipal liability under a theory of inadequate training. The Jail Policies and Procedures Manual required all officers to be certified in basic first aid. This training included, among other things, types of and action required for potential emergency situations, CPR, the signs and symptoms of an emergency health condition, the methods for obtaining medical care, and the procedures for transferring or transporting prisoners to appropriate health care providers.[47] Despite this training, several officers stated they did not have the knowledge or training that would have allowed them to determine whether an inmate with elevated blood pressure required emergent care.[48]

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."[49]

The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain

---

[47] Docket No. 65-4, at 30.

[48] Docket No. 66 ¶ 20 ("I also was not very familiar with vital signs at the time and when they are so high an inmate needs to go to the hospital at that time."); Docket No. 72 ¶ 14 ("The vital signs did not concern me because I am not a medical professional and did not know that I should be overly concerned at Hunter's blood pressure vitals since many inmates have an elevated blood pressure when they are detoxing from drug use and the natural stress that can come from being incarcerated."); *Id.* ¶ 21 ("I had no reason or ability through my training or experience to question what Nurse Smuin told me and I relied upon it and believed that Mr. Hunter would be fine and that he would get his medication in the morning."); Docket No. 73 ¶ 8 ("Decedent's vital signs did not concern me because I am not a medical professional and many inmates I had previously dealt with had an elevated blood pressure due to detoxing from drug use and the natural stress that can come from first being incarcerated."); Docket No. 77-5, at 22:16–18 ("No, I did not have enough knowledge or in-jail training at the time to make a [sic] educated guess or suggestion on anything of that sort."); Docket No. 77-9, at 22:11–23:6 (stating that her understanding of blood pressure requiring emergent care as 220/120); Docket No. 77-11, at 30:7–15 (stating that he did not have medical training and relied upon the nurses to make medical decisions).

[49] *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.[50]

Here, there is no evidence of a pattern of tortious conduct. More specifically, there is no evidence of any prior adverse incidents involving hypertensive inmates. Thus, Plaintiff has failed to establish that the County had notice that its training was deficient.[51] Therefore, the question becomes whether "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."[52]

Plaintiff has failed to show that the need for additional or different training was so obvious that a violation of constitutional rights was likely to occur by not providing it. As stated, officers received basic first aid training, which included identifying the types of emergency medical situation and how to respond to them. There is nothing to suggest that the need for further training on hypertension was so obvious and the inadequacy of the training the officers received was so likely to result in a constitutional violation that the County can be said to have been deliberately indifferent. While some officers may not have been aware of when heightened

---

[50] *Bryson*, 627 F.3d at 789 (10th Cir. 2010) (quoting Barney, 143 F.3d at 1308).

[51] *Connick*, 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").

[52] *City of Canton*, 489 U.S. 390.

blood pressure required emergency care, the fact "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city."[53]

Moreover, the fact that additional training may have been beneficial is not sufficient. The Supreme Court has made clear that merely showing that additional training would have been helpful or could have avoided the injury is not sufficient to establish municipal liability.[54] "Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal."[55] Thus, Plaintiff has failed to make out a claim for inadequate training.

Finally, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983."[56] Plaintiff has presented no evidence that any alleged training deficiency, assuming one exists, reflects a deliberate or conscious choice of the County. As a result, Plaintiff has failed to demonstrate that the County may be liable.

## IV. CONCLUSION

It is therefore

ORDERED that Defendants' Motion for Summary Judgment (Docket No. 64) is GRANTED.

---

[53] *Id.*

[54] *Connick*, 563 U.S. at 68; *City of Canton*, 489 U.S. at 391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").

[55] *City of Canton*, 489 U.S. at 391.

[56] *Id.* at 389.

DATED this 10th day of June, 2019.

BY THE COURT:

_____

Ted Stewart
United States District Judge